**UCA, L.L.C., d/b/a Adelphia Cable Communications, Plaintiff,**

v.

**LANSDOWNE COMMUNITY DEVELOPMENT, LLC, et al., Defendants.**

**No. Civ.A. 02–314–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 12, 2002.

John Douglas McKay, McKay Law Offices, Charlottesville, VA, for plaintiff.

Maureen Byrne Beahn, Jennifer Keith Cannon, Shaw Pittman, LLP, McLean, VA, Tina R. Reynolds, Shaw Pittman, LLP, Washington, D.C., Kevin Timothy Garofoli, Troutman Sanders, LLP, Washington, DC, Stephen Atherton Northup, Troutman, Sanders, LLP, Richmond, VA, for defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

This case presents, *inter alia,* the novel question whether under the Pole Attachments Act, 47 U.S.C. § 224(f) (the "Pole Act"), a utility must grant a party access to that utility's right-of-way where, as here, that right-of-way is created by a limited easement that, under applicable state law, does not include the rights to which the party seeks access.

The parties have all filed dispositive motions: plaintiff has filed a motion for summary judgment; defendant Virginia Electric Power Company has filed a cross-motion for summary judgment; and the

remaining defendants have joined in a cross-motion for summary judgment. In addition, the parties have submitted a joint stipulation of facts. Because no material issues of fact remain in dispute, the matter is ripe for summary disposition.

## I.

The sole plaintiff, UCA, L.L.C. d/b/a Adelphia Cable Communications ("Adelphia"), is a cable operator that holds a franchise to operate a cable system within Loudoun County pursuant to the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.*

There are six named defendants, and the questions presented make it important to understand the nature of each defendant and the relationships among the various defendants. Defendant Lansdowne Community Development, LLC ("LCD"), a Virginia limited liability company, is the original owner and developer of a residential development in Loudoun County, Virginia, known as Lansdowne on the Potomac (the "Development").[1]

Defendant LCD Communications, LLC ("LCD Communications"), a Virginia limited liability company, is LCD's wholly owned subsidiary. It was organized to facilitate the provision of telecommunications services for the Development.

Defendant OpenBand of Virginia, LLC ("OBV"),[2] also a Virginia limited liability company, is a competitive local exchange carrier certified to provide local exchange and interexchange services throughout Virginia. OBV is a wholly owned subsidiary of nonparty M.C. Dean, Inc. ("M.C.Dean"), which is a technical services contractor that specializes in the design, installation, systems integration, testing, and follow-on maintenance for power, electronic, and communications systems.

Defendant OpenBand Multimedia, LLC ("OBM"), another Virginia limited liability company, is a provider of multimedia services that has been certified to operate an open video system[3] in parts of Loudoun County, Virginia. OBM, like OBV, is a wholly owned subsidiary of M.C. Dean.

Defendant OpenBand at Lansdowne, LLC ("OBL"), yet another Virginia limited liability company, was organized to secure telecommunications services for homeowners in the Development and to facilitate the construction and operation of the infrastructure necessary to deliver those services. OBL is owned equally by LCD Communications and OpenBand SPE, LLC ("OSPE"). OSPE, in turn, is a wholly owned subsidiary of M.C. Dean.[4]

Defendant Virginia Electric and Power Company d/b/a Dominion Virginia Power ("DVP") is a Virginia public service corpo-

---

**1.** The member-owners of LCD are Centex Homes, Beazer Homes Corp., WL Homes, LLC d/b/a John Laing Homes—Washington Division, and Van Metre Lansdowne Investments, LLC. LCD's only asset is the Development property.

**2.** OBV is the successor in interest to Open-Band of Virginia, Inc. through a merger that occurred on September 7, 2001. By reason of the merger, OBV assumed Open Band of Virginia, Inc.'s contractual rights and obligations. As this succession in interest is not material to the resolution of the pending motions, both entities will be referred to as "OBV."

**3.** See 47 U.S.C. § 573; 47 C.F.R. § 76.1500 *et seq.* (providing for the certification and regulation of open video systems).

**4.** The five defendants LCD, LCD Communications, OBV, OBM, and OBL are referred to collectively throughout as the "Lansdowne Defendants." The business relationships among the Lansdowne Defendants and other related entities and the various agreements they made with respect to the Development are represented in the diagram attached as Exhibit A to this Memorandum Opinion.

ration engaged in the transmission and distribution of electricity to residential and commercial customers in Virginia, North Carolina, and West Virginia. The Development is within DVP's service territory.

The Development comprises 850 acres of land along the Potomac River on which 2,135 single family attached and detached homes will be built. It is divided geographically into designated Sections, three of which (Sections 2, 3, and 4) are specifically in issue here. LCD, as developer, formulated a plan to provide comprehensive telecommunications services to the Development, including telephone, video cable television, and broadband Internet service. Pursuant to this plan, LCD evaluated several telecommunications service providers before ultimately choosing defendants OBV and OBM as exclusive providers of comprehensive telecommunications services to the Development.[5] To ensure that the grant of telecommunica-

tions service rights would be exclusive to the selected providers, LCD orchestrated a series of easements designed to allocate certain property rights for the Development and, in particular, to vest exclusive control of essential telecommunications rights in a single entity, which would then contract with OBV and OBM for telecommunications services. Because the terms of these easements are central to the resolution of the questions in issue, they must be described in some detail.

Three easements central to this dispute were granted on May 14, 2001. The first (the "OBV/OBM Easement") is an easement in common from LCD to defendants OBV and OBM, wherein OBV and OBM were jointly granted within designated areas of the Development[6] the right to build, operate, and maintain the infrastructure necessary for the provision of telephonic, video, Internet, and other communications services.[7] The easement is limited geo-

---

5. Adelphia was not one of the telecommunications service providers evaluated by LCD.

6. The OBV/OBM Easement was limited geographically

 to (i) those areas of land between the parcels of property being leased by Grantees or their designee or any successor or assignee of this Easement (the "Leased Sites"), and (ii) the area of land extending from the Leased Sites to the boundary of the Property to allow Grantees or their designee or any successor or assignee of this Easement to have multiple diverse routes to connect to other telecommunications facilities and to customers outside of the Property.

 OBV/OBM Easement ¶ 2(a). The easement goes on to provide that

 [s]uch easements shall be replaced at such time as permanent alternate easements of specific width and length, which shall be shown on an easement plat(s) to be recorded with an alternate deed of easement, have been approved ... deeded ... and recorded.

 Id. No such "permanent alternate easements" currently exist. The parties have stipulated that the "Leased Sites" referred to in the OBV/OBM Easement are the switching facili-

ty for telecommunications services (the "Central Office Site") and the video headend (the "Video Headend Site"), where video signals are received. The proposed Central Office Site is located in Section 18 of the Development, which abuts Section 4. There is currently no confirmed location for the Video Headend Site. The Central Office has not yet been built and no connections currently exist between the Central Office Site and the Video Headend Site.

7. The OBV/OBM Easement's pertinent language is as follows:

 Easements for the purpose of constructing, operating, maintaining, adding to, altering or replacing (collectively, "Administering" or "Administer") antennas, satellite or terrestrial receiving or transmitting dishes, communication towers, present or future underground or above ground telecommunications (including but not limited to telephone, internet, television, cablevision and other related or accessory information communication facilities) lines, cables (including fiber optic cables), plus all necessary above and below ground structures and appurtenances for the collection, provision and distribution of video, telephonic, inter-

graphically and temporally. It does not include the right to build or operate house connection lines and it was granted only for the duration of OBV and OBM's joint lease of certain property at the Development (including renewals and extensions of the lease). The easement gives OBV and OBM the right to assign or license any of the rights or privileges they obtained through the OBV/OBM Easement to any third party without obtaining the consent of LCD.[8] LCD, in turn, expressly reserved the right to grant other utility or telecommunications easements on the Development property.[9]

The second easement (the "LCD Communications Easement") is a grant from LCD to defendant LCD Communications entitled "Exclusive Easement for Telecommunications Services at Lansdowne on the Potomac." Importantly, this easement describes the OBV/OBM Easement as a "surviving easement" meant to coexist with the exclusive LCD Communications Easement. While much of the LCD Communications Easement mirrors the OBV/OBM Easement, there are substantial differences between the two. The OBV/OBM Easement is of limited duration and is confined to the land between certain parcels of property being leased by OBV and OBM, whereas the LCD Communications Easement is granted in perpetuity without

geographic limitation[10] and includes the right to build, operate, and maintain "house connection lines."[11] The LCD Communications Easement expressly states that LCD may not grant any other telecommunications services easement in the Development that would interfere with the exclusive grant of such rights to LCD Communications.[12]

In the third easement granted on May 14, 2001 ( the "OBL Easement"), LCD Communications conveyed to defendant OBL the entire easement LCD had previously conveyed to LCD Communications. Thus, the "Exclusive Easement for Telecommunications Services" at the Development is currently held by OBL and encumbers the entire Development, including the Sections of the Development in issue here.

On July 24, 2001, OBL entered into a services agreement with OBV and OBM, pursuant to which OBV is obligated to provide telephone services, and OBM is obligated to provide video, Internet, and other telecommunications services, to Development homeowners. Under this agreement, OBV and OBM provide service to homeowners by connecting to OBL's infrastructure of house connection lines. The Lansdowne Homeowners Association pays OBV and OBM for basic telephone, video, and Internet services provided to

---

net, data services or other communications, data or media (collectively "Utilities") and its transmission on, in, through and across the said Property of Owner.
OBV/OBM Easement ¶ 2(a).

**8.** In this respect, the OBV/OBM Easement granted OBV and OBM the right

> without the consent of [LCD], (a) to transfer and/or assign, without limitation, all or any part of the rights, privileges, easements and ... obligations granted by this instrument to any third party and (b) to grant, transfer and/or assign any easements or licenses to third parties consistent with [OBV and OBM's] rights hereunder.

OBV/OBM Easement ¶ 9.

**9.** *See* OBV/OBM Easement ¶ 8.

**10.** It is expressly contemplated in the LCD Communications Easement that the blanket easement over the entire property will be replaced with permanent alternate easements of specific width and length. But such permanent alternate easements will still include the right to relocate the easements or create new easements as necessary. *See* LCD Communications Easement ¶ 2(a).

**11.** LCD Communications Easement ¶ 2(a).

**12.** *See* LCD Communications Easement ¶ 8.

Development homeowners. The homeowners, in turn, must pay dues to the Lansdowne Homeowners Association for these basic telecommunications services regardless of whether they obtain the services from OBV and OBM or from other providers.

To obtain electricity for the Sections of the Development in issue here, LCD on October 30, 2001 and February 13, 2002 conveyed two easements to defendant DVP (the "DVP Easements"):[13] one with respect to Section 2 of the Development, and a second with respect to Sections 3 and 4 of the Development. These perpetual easements grant to DVP the right to lay distribution and service lines to provide electric power to residents and include the right to use the easements for internal communication purposes "incidental to the transmission and distribution of electric power."[14] The DVP Easements provide DVP with access to each lot in the designated Sections of the Development. They also grant DVP the right to attach the "wires and facilities of any other public service company." But the rights of any such other public service company that gains access to the DVP Easements are expressly limited by the "Exclusive Easement for Telecommunications Services" currently held by OBL.[15]

The current dispute relates to Adelphia's claimed right to lay and operate its service lines in Sections 2, 3, and 4 of the Development. In this regard, Adelphia sent a letter to LCD in October 2001 to request access to the Development to lay its communications lines.[16] On December 6, 2001, a representative of OBL, the holder of the "Exclusive Easement for Telecommunications Services," met with a representative of Adelphia regarding access to the Development, but they failed to reach agreement. DVP became aware of this dispute concerning access to the Development in early January 2002, when Adelphia contacted DVP and expressed a desire to lay its own communications lines in trenches to be opened later in the month by DVP and OBL in Section 2 of the Development. DVP informed Adelphia that it was agreeable to Adelphia's participation in the trench operation, but that LCD refused to provide access unless Adelphia negotiated a commercial agreement with LCD and OBL for use of the trench. Soon thereafter LCD wrote to Adelphia that any attempt to gain access to the trench without a prior agreement could result in LCD or others summoning local law enforcement and initiating trespassing charges against Adelphia employees or contractors.

Adelphia did not reach agreement with LCD or OBL concerning access to any part of the Development and instead filed this action in Loudoun County Circuit Court on February 20, 2002, seeking to force defendants to grant Adelphia access to certain easements and Sections of the Development at federally regulated rates, pursuant to § 224(f) of the Pole Act. DVP, with the consent of the other defendants, removed the matter to this Court on March 1, 2002. Adelphia's complaint alleges one count of declaratory relief and one count of injunctive relief. Specifically, Adelphia seeks

(i) a judicial declaration that it has the right to access the DVP, OBL, and OBV/OBM Easements and to be free from interference with respect to the exercise of such right;

---

13. DVP had previously been granted an easement for Section 1, which is not in issue in this case.

14. DVP Easements ¶ 1, Exhibit A.

15. DVP Easements ¶ 1, Exhibit A.

16. The letter was dated October 18, 2001, but was not received by LCD until approximately January 3, 2002.

(ii) a preliminary and permanent injunction prohibiting defendants from interfering with Adelphia's access to the various easements and prohibiting all defendants from interfering with Adelphia's competitive provision of telecommunications services; and

(iii) a judgment granting reimbursement of the additional expenses Adelphia will incur in retrenching the Development to lay its lines because it was denied access to the joint trenches.

Following the denial of threshold dismissal motions,[17] the parties were directed to stipulate the material facts to allow the matter to be decided on summary judgment.[18] The parties complied, filing a joint stipulation of facts and cross-motions for summary judgment.[19]

Common to all the motions is the question of what it means to own or control a right-of-way within the meaning of the Pole Act's nondiscriminatory access provision, 47 U.S.C. § 224(f). The Lansdowne Defendants' motion for summary judgment raises the additional questions of (i) whether granting access to Adelphia under § 224(f) would effect an unconstitutional taking with respect to OBM's interest in the OBV/OBM Easement, (ii) whether granting access to Adelphia under § 224(f) would unreasonably interfere with OBM's use and enjoyment of the OBV/OBM Easement, and (iii) what entities are encompassed within the Pole Act's definition of a "utility." Each question is separately addressed.

## II.

Adelphia claims it is entitled to access the DVP Easement by virtue of § 224(f), the Pole Act's nondiscriminatory access provision. DVP contests Adelphia's claim, arguing that, although DVP is a utility that owns or controls rights-of-way used for wire communications within the meaning of the Pole Act, DVP, under Virginia law, does not own or control within the meaning of § 224(f) the easement right Adelphia seeks here.

### A.

The nondiscriminatory access provision of the Pole Act requires a utility[20] that uses its poles, ducts, conduits, or rights-of-way for wire communications[21] to "provide

---

17. *See UCA, L.L.C. v. Lansdowne Community Development, LLC,* Civ. No. 02–314–A (E.D.Va. Apr. 12, 2002) (order).

18. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

19. Plaintiff filed a motion for summary judgment; defendant Virginia Electric Power Company filed a cross-motion for summary judgment; and the Lansdowne Defendants joined in a cross-motion for summary judgment.

20. A "utility" is defined in the Pole Act as

any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State. 47 U.S.C. § 224(a)(1).

21. "Wire communication" is defined for purposes of the Pole Act as

the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission. 47 U.S.C. § 153(52).

a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." 47 U.S.C. § 224(f)(1). A utility may deny access to space it owns or controls only where there is insufficient capacity or some safety, reliability, or other engineering problem. *See* 47 U.S.C. § 224(f)(2).

The key to the application of this provision of the Pole Act is the meaning of the phrase "owned or controlled." Although this phrase is not statutorily defined, the FCC, which is charged with regulating the "rates, terms, and conditions for pole attachments," [22] has determined that "[t]he scope of a utility's ownership or control of an easement or right-of-way is a matter of state law," meaning that "the access obligations of section 224(f) apply when, as a matter of state law, the utility owns or controls the right-of-way to the extent necessary to permit such access." [23] The FCC subsequently elaborated on this determination by noting that "utility ownership or control of rights-of-way and other covered facilities exists only if the utility could voluntarily provide access to a third party and would be entitled to compensation for doing so." [24] Importantly, the FCC emphasized that "state law determines whether, *and the extent to which,* utility ownership or control of a right-of-way exists in any factual situation within the meaning of Section 224." [25]

Adelphia argues unpersuasively that the FCC's interpretation of the phrase "owned or controlled" in § 224(f) is contrary to the language and intent of the Pole Act and should be disregarded. The FCC guidelines with respect to the meaning of this phrase were promulgated pursuant to the FCC's authority to regulate the rates, terms, and conditions for pole attachments. Given this, the FCC's interpretation of the phrase must be reviewed deferentially in accordance with the familiar two-step process articulated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The first step in the *Chevron* analysis is to ascertain whether Congress has spoken unambiguously "to the precise question at issue." If the language of the statute is unambiguous, the analysis goes no further because the statute must be interpreted to give effect to clear congressional intent. *Id.* at 842–43, 104 S.Ct. 2778. If, however, ambiguity infects the statute, that is, the statute does not speak precisely to the question in issue, then the second step in the review requires an examination of whether the agency's resolution of the ambiguity is a reasonable interpretation of congressional intent. *Id.* at 844, 104 S.Ct. 2778. If so, a court must defer to an agency's reasonable interpretation of congressional intent. *Id.* at 844–45, 104 S.Ct. 2778.

---

**22.** 47 U.S.C. § 224(b).

**23.** Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, CC Docket No. 96–98, 11 F.C.C.R. 15,499, 16,082 ¶ 1179 (Aug. 8, 1996) (hereinafter Local Competition First Report and Order).

**24.** Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Fifth Report and Order and Memorandum Opinion and Order, CC Docket No. 96–

98, 15 F.C.C.R. 22,983, 23,023, ¶ 87 (Oct. 25, 2000) (hereinafter Local Competition Fifth Report and Order).

**25.** Local Competition Fifth Report and Order, 15 F.C.C.R. at 23,023, ¶ 87 (emphasis added). The FCC went on to note that "the extent of a utility's ownership or control of a duct, conduit, or right-of-way under state law must be resolved prior to a complaint being filed with the Commission regarding whether the rates, terms or conditions of access are reasonable." *Id.* at 23,024, ¶ 89.

It is apparent here that the Pole Act does not speak precisely to the question at issue, namely, how the phrase "owned or controlled" in § 224(f) is to be defined.[26] Nothing in the language of the statute specifies how a utility's ownership or control of a right-of-way is to be determined or otherwise makes manifest any clear congressional intent with respect to those terms. The absence of a statutory definition of the phrase "owned or controlled" is a gap in the statutory scheme, which the FCC is authorized to fill. *See NCTA*, 534 U.S. at ——, 122 S.Ct. at 786; *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778. And, in these circumstances, a court must defer to the FCC's interpretation of the Pole Act to the extent that the FCC's interpretation is reasonable. *See Chevron* 467 U.S. at 844–45, 104 S.Ct. 2778.[27]

■ Here the reasonableness of the FCC's interpretation of the phrase is manifest; it follows logically from the principle that state law is the source of legal interests and rights in property. *See Drye v. United States*, 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999). Thus, in concluding that under the Pole Act a utility's ownership and control of easement rights must be determined by reference to state law, the FCC is simply recognizing and giving effect to the reality that a utility can only grant access to easement rights it has and those rights derive solely from state law.[28] Given the manifest reasonableness of the FCC's interpretation, *Chevron* deference to that interpretation is required.

In opposition to this result, Adelphia argues that the meaning of the phrase "owned or controlled" should be determined not by reference to state law, but construed instead as a matter of federal common law. And, in this respect, Adelphia further contends that the phrase should be interpreted such that *any* degree of ownership or control for *any* purpose is sufficient to trigger the Pole Act's nondiscriminatory access provision. Adelphia's argument confuses the definition of a utility in § 224(a) and the breadth of the access obligation in § 224(f) with the fundamental question of whether a right-of-way is "owned or controlled" by a utility.[29] Indeed, the result of Adelphia's ar-

---

**26.** Adelphia argues that the Supreme Court recently held, in *National Cable Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) (hereinafter *NCTA*) that the Pole Act is unambiguous with respect to the "owned or controlled" requirement. This argument misconstrues *NCTA;* the holding of that case is more limited. There, the Supreme Court found that the Pole Act unambiguously applies to attachments that provide high-speed Internet access, as well as cable television. *NCTA*, 534 U.S. at ——, 122 S.Ct. at 786. But significantly, the Supreme Court did not specifically address the meaning of "owned or controlled," as that statutory language was not in issue.

**27.** *See also NCTA*, 534 U.S. at ——, 122 S.Ct at 786, 790 (indicating that deference to FCC interpretations is required where the Pole Act is found to be ambiguous); *Southern Co.*, 293 F.3d at 1352–53 (deferring to the FCC's interpretation with respect to four guidelines, but

finding that two other guidelines were contrary to the language of the Pole Act).

**28.** Further supporting the reasonableness of the FCC's interpretation is the Pole Act's general posture of deference toward state regulation. Indeed, the Pole Act allows a state to preempt FCC regulation altogether if the state has a comprehensive regulatory system for pole attachments. *See* 47 U.S.C. § 224(c). Specifically, § 224(c)(1) provides that

Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f) of this section, for pole attachments in any case where such matter are regulated by a State.

**29.** It is settled that a utility's ownership or control of *any* rights-of-way used for "wire communications" triggers the utility's obli-

gument is that landowners would not be able to control access to their land through limited grants to utilities. Thus, in making this argument, Adelphia in effect argues that the Pole Act was intended to limit landowners' ownership rights, as well as utilities' ownership rights. This position finds no support in the statute, its purpose, or the cases construing and applying the statute. Instead, the cases are clear that the Pole Act was intended to deal with monopolistic behavior by utilities, not monopolistic behavior by landowners.[30] There is no indication that Congress, in passing the Pole Act, intended to strip property owners of the ability to divide and allocate their property rights as they see fit to provide them with the greatest benefit. The intent of the Pole Act was actually the opposite: to allow landowners to choose among the services of various cable and telecommunications providers in the face of a utility's often exclusive control of an easement burdening the landowners' property. This case presents the situation of a landowner (LCD) exercising its legitimate "monopoly" control over its property rights; a landowner's "monopoly" over his or her own land violates neither the letter nor the intent of the Pole Act.

In sum, the FCC's interpretation of the Pole Act is a reasonable interpretation of congressional intent; it is completely consistent with both the general principle that

---

gation to grant nondiscriminatory access to *all* rights-of-way "owned or controlled" by it. 47 U.S.C. §§ 224(a), (f); *Southern Co. v. FCC*, 293 F.3d 1338, 1349 (11th Cir.2002). In other words, § 224(f) mandates access to all telecommunications easements owned or controlled by a utility even though the utility uses only one of those easements for wire communications. But the breadth of the access requirement in this respect does not support Adelphia's contention that the Pole Act requires a utility to grant cable television providers access to a right-of-way when the utility has *any* degree of ownership or control of the right-of-way. Adelphia's proposed construction would require a utility to grant access to rights it does not possess, a result Congress neither contemplated nor directed in the Pole Act.

**30.** *See NCTA*, 534 U.S. at ——, 122 S.Ct. at 784 ("[Cable companies] have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles. Utilities, in turn, have found it convenient to charge monopoly rents.").

The history of the Pole Act lends support to the conclusion that the Pole Act was meant to limit utility monopolies, not to restrict or limit the rights of landowners. Thus, the Pole Act was passed in 1978 in response to cable television ("CATV") providers' concerns about alleged monopoly pricing activities by electric utilities with respect to attachments of cable television wires to electric utility infrastructure. *See FCC v. Florida Power Corp.*, 480 U.S. 245, 247, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). In response to these concerns, the Pole Act empowered the FCC to determine "just and reasonable" rates that a utility could charge CATV providers for access to the utility company's poles, ducts, conduits, and rights-of-way. 47 U.S.C. § 224(b). But, as originally enacted, the Pole Act did not require a utility to provide cable companies with access to its poles and other rights-of-way. Instead, if a utility voluntarily chose to provide access, the Pole Act provided that the rate charged for that access was subject to FCC regulation. Voluntary access was not an issue at the time, as utilities were eager to lease surplus space on their poles or in their conduits. *See Southern Co.*, 293 F.3d at 1341. By 1996, the economic landscape with respect to pole attachments had undergone a fundamental change; electric utilities had begun to see the telecommunications arena as a choice for diversification of their businesses, and CATV providers feared that the utilities' entry into the telecommunications market would endanger access to utility rights-of-way. *See id.* In 1996, Congress addressed the CATV industry's concerns by adding a nondiscriminatory access provision to the Pole Act as part of the Telecommunications Act of 1996. Pub.L. No. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). This new legislation was plainly intended to address the relationship between CATV providers and utilities, not CATV providers and landowners.

easement rights in real property are created by state law and Congress's purpose in passing the Pole Act, which was to prevent utilities from exploiting monopoly control of easements. Accordingly, the FCC's interpretation is controlling and entitled to deference.

### B.

The next step in the analysis of Adelphia's claimed right to access the DVP Easements is to determine whether DVP owns or controls, within the meaning of § 224(f), the rights-of-way to which Adelphia seeks access. This question is resolved, in accordance with the FCC's guidance, by ascertaining whether as a matter of Virginia law DVP could voluntarily provide the requested access to a third party and receive compensation for doing so. This determination requires an analysis under Virginia law of the two easements granted to DVP and the "Exclusive Easement for Telecommunications Services" granted to OBL.

[2–4] An exclusive easement for *a particular purpose* is permissible and valid under Virginia law. *See Walton v. Capital Land, Inc.*, 252 Va. 324, 477 S.E.2d 499, 501 (1996). In such an easement, "the landowner retains the right to use the land in ways not inconsistent with the uses granted in the easement." *Id.*[31] Thus, in this case, when LCD conveyed to LCD Communications (and then, ultimately, to OBL) the exclusive right to install and operate telecommunications infrastructure in the Development, LCD retained the right to use the Development only in ways not inconsistent with that grant. In other words, LCD's bundle of property rights in the Development had been stripped of the right to lay and operate lines or cables for providing telecommunications services to Development residents. Accordingly, when LCD subsequently conveyed the DVP Easements, DVP could acquire only those rights that LCD still held after the prior grant of the exclusive OBL Easement. And those rights did not include the rights to which Adelphia now seeks access.[32] Indeed, the DVP Easements do not purport to convey the right to build infrastructure to provide telecommunications services to Development residents; instead, both DVP Easements explicitly state that they are subject to the existing exclusive telecommunications easement held by OBL. Simply put, DVP does not possess the rights to which Adelphia seeks access because those rights were included

---

31. *See also Multi–Channel TV Cable Co. d/b/a Adelphia Cable Comm. v. Charlottesville Quality Cable Corp.*, 65 F.3d 1113, 1120 (4th Cir. 1995) (quoting *Brown v. Haley*, 233 Va. 210, 355 S.E.2d 563, 567–68 (1987)) ("An easement … is a privilege to use the land of another in a particular manner and for a particular purpose. It creates a burden on the servient tract and requires that the owner of that land refrain from interfering with the privilege conferred for the benefit of the dominant tract."). An exclusive easement *for all purposes* is considered a transfer in fee and is not favored in Virginia. *See Walton*, 477 S.E.2d at 501.

32. *Cf. C/R TV, Inc. v. Shannondale Inc.*, 27 F.3d 104 (4th Cir.1994). In *Shannondale*, a case relying on West Virginia Law, a developer granted an easement over its property to an electric utility and the easement included the right to attach to poles telephone wires, as well as electric wires. The developer later purported to grant an exclusive easement to a cable operator. A different cable operator then sought access to the subdivision through the electric utility's easement. The Fourth Circuit found that the developer could not exclude the second cable operator, despite the purportedly exclusive easement, because the electric utility's rights were obtained prior to the conveyance of the exclusive easement. *Shannondale* illustrates the importance of the order in which easements are granted. Here, unlike in *Shannondale*, the exclusive easement was granted *prior* to LCD's grant of easements to DVP.

in a prior, exclusive easement granted to OBL.

This result is not affected by DVP's right to apportion the DVP Easements and allow the attachment of wires and facilities of other public service companies.[33] Although the right of apportionment exists with respect to an exclusive easement in Virginia,[34] the DVP Easements are limited to the provision of electricity and to internal telecommunications "incidental to the transmission of electric power." Therefore, the right of apportionment in the DVP Easements extends only to uses of the easements for the provision of electricity and for internal communications incidental to the provision of electricity, but for no other purposes.

In sum, DVP could not voluntarily provide access to its right-of-way to a third party who wishes to offer telecommunications services to Development residents, and therefore does not own or control within the meaning of § 224(f) any of the rights sought by Adelphia. Accordingly, DVP's motion for summary judgment must be granted and Adelphia's motion for summary judgment with respect to the DVP Easements must be denied.

### III.

Adelphia claims it is also entitled to access the OBV/OBM Easement by virtue of § 224(f). The Lansdowne Defendants contest this claim, arguing (i) that OBV does not own or control the OBV/OBM Easement to the extent necessary to grant Adelphia's request, (ii) that granting access to Adelphia would effect an unconstitutional taking because the easement is jointly owned by an entity—OBM—that is not a utility, and the Pole Act has no provision for compensating entities that are not utilities, and (iii) that granting access to Adelphia would unreasonably interfere with OBM's use and enjoyment of the easement.

### A.

As a preliminary matter, it is clear that OBV is a "utility" within the meaning of § 224(a)(1) and thus is subject to the nondiscriminatory access requirement of § 224(f) for rights-of-way that it owns or controls. This is so because the Pole Act's definition of a "utility" explicitly includes a local exchange carrier[35] and it is undisputed that OBV is such a carrier.[36] Thus, as was the case in connection with the DVP Easements, the question raised by Adelphia's claim of access to the OBV/OBM Easement is whether OBV has the ability under Virginia law voluntarily to provide access to this easement to a third party and to receive compensation for doing so.

Here, OBV clearly possesses the right to lay telecommunications cables and provide telecommunications services, as

---

**33.** *See* DVP Easements ¶ 8 (granting DVP the right "to assign or transfer, without limitation, to any public service company all or any part of the perpetual right, privilege and easement"); *id.* Exhibit A ¶ 1 (granting the easement "for the attachment of the wires and facilities of any other public service company").

**34.** *See Hise v. BARC Electric Coop.*, 254 Va. 341, 492 S.E.2d 154, 157 (1997) (defining the relationship between exclusivity and right of apportionment with respect to prescriptive easements and easements acquired by eminent domain).

**35.** 47 U.S.C. § 224(a)(1) (including in the definition of "utility" a "local exchange carrier," but not differentiating between incumbent and competitive local exchange carriers).

**36.** Although the parties did not agree in the joint stipulation of facts that OBV is a utility, there is no real dispute on this issue, as counsel for OBV affirmed in the course of the summary judgment hearing that OBV is indeed a utility within the meaning of the Pole Act.

this right is explicitly granted in the OBV/OBM Easement. This right, although not exclusive,[37] is apportionable:[38] OBV is granted "the right without the consent of [the landowner] ... to grant, transfer and/or assign any easements or licenses to third parties...."[39] Thus, by the plain language of the OBV/OBM Easement, OBV has the ability, if it chooses to do so, to provide access to a third party and receive compensation for doing so because it is explicitly given the right to grant easements or licenses to third parties.[40]

■ Despite this, the Lansdowne Defendants argue that the rights OBV possesses are not those that Adelphia seeks to access because the OBV/OBM Easement is temporally and geographically limited and does not include the right to administer house connection lines.[41] This argument is unpersuasive. There is nothing in the Pole Act or FCC interpretations of the Pole Act to suggest that temporal and geographic ownership limits have any effect on the statute's mandatory access requirement. To be sure, Adelphia cannot obtain through § 224(f) more than what was conveyed to OBV; any right of access gained by Adelphia through the operation of § 224(f) would be limited temporally to the same term of years as OBV's ownership and limited geographically to the same "backbone" where OBV has the right to lay cables and provide telecommunications services. This might result in the access being of little ultimate benefit to Adelphia,[42] but it does not affect the operation of the statute's mandatory access requirement. Thus, OBV and the OBV/OBM Easement are subject to the nondiscriminatory access requirement of § 224(f), regardless of the easement's temporal and geographic limitations.

## B.

The Lansdowne Defendants make two additional arguments against mandatory

**37.** LCD (the grantor) expressly reserved the "right to grant or assign other utility easements or telecommunications easements on the [Development] ...," OBV/OBM Easement ¶ 8, which right LCD exercised when later granting the exclusive telecommunications easement to LCD communications and the easements to DVP.

**38.** As a basic tenet of property law "[t]he apportionability of an easement in gross is determined by the manner or terms of its creation." Restatement of Property § 493; *See also Hise,* 492 S.E.2d at 157 (citing to and relying upon comments to Restatement of Property § 493).

**39.** *See* OBV/OBM Easement ¶ 9.

**40.** With respect to the OBV/OBM Easement, it makes no difference that OBL holds a separate, exclusive telecommunications easement because the exclusive telecommunications easement was granted *after* the OBV/OBM Easement. The grant of exclusive rights to OBL cannot adversely affect rights that OBV had previously obtained, given that OBV was not a party to the easement held by OBL. *See Shannondale,* 27 F.3d at 109 (finding that the utility might have been stripped of its rights if it had been a party to the subsequent exclusive cable easement).

**41.** The OBV/OBM Easement was granted for a limited time as defined by the term of OBV/OBM's lease of certain property. The OBV/OBM Easement is also limited geographically to a sort of "backbone" in the Development between designated "Leased Sites"—the Central Office Site and the Video Headend Site—and from those Leased Sites to the boundary of the Development. *See supra* note 6.

**42.** Because the location of the Video Headend Site has not yet been finally determined, it is possible that the "backbone" between the two leased sites would provide very limited access to the Development. Additionally, because the OBV/OBM Easement does not allow for house connection lines., the access Adelphia might gain to the OBV/OBM backbone through the OBV/OBM Easement would not permit Adelphia directly to serve homeowners in the Development without an additional agreement to access the OBL infrastructure.

access to the OBV/OBM Easement, neither of which is persuasive, First, the Lansdowne Defendants argue that granting Adelphia access to the OBV/OBM Easement would constitute an unconstitutional taking with respect to OBM (the joint owner of the easement) because the Pole Act provides no mechanism for compensating nonutilities such as OBM. Second, the Lansdowne Defendants argue that granting access to the OBV/OBM Easement would interfere with OBM's use and enjoyment of its easement rights.

■ Analysis of these arguments properly begins with recognition of the settled principle that mandating nondiscriminatory access under § 224(f) constitutes a per se taking. *See Gulf Power Co. v. United States*, 187 F.3d 1324, 1328–31 (11th Cir. 1999). Yet the Pole Act also provides a constitutionally adequate process for obtaining just compensation for the taking. *See id.* at 1331–36. And where, as appears here, the access sought is to the utility's undivided interest in the easement, the fact that a joint owner of the easement is a nonutility is no bar to the operation of § 224(f). Were the law to the contrary, a utility could escape the Pole Act's nondiscriminatory access requirement merely by granting a minimal ownership interest in a right-of-way to a nonutility.

In the circumstances, Adelphia has the right to access OBV's undivided interest in the OBV/OBM Easement and must pay OBV just compensation for this access. Importantly, this access is limited to

OBV's undivided interest in the easement; it does not extend to OBM's easement rights; OBM maintains all of its easement rights, which re neither affected nor taken by Adelphia's access to, and use of, OBV's easement rights.[43] It must be emphasized that § 224(f) does not authorize any taking of OBM's easement rights. And there are no facts in the summary judgment record to suggest that Adelphia's use of OBV's undivided interest in the OBV/OBM Easement will result in either a taking of OBM's easement rights or any interference with OBM's use and enjoyment of those rights.[44]

Also, the analysis thus far has proceeded on the assumption that Adelphia's use of OBV's undivided interest in the OBV/OBM Easement would not preclude OBV's use of the easement. In the event that Adelphia's use of OBV's undivided interest in the OBV/OBM Easement were to present problems of insufficient capacity, safety, or engineering to OBV, there is a statutory remedy: OBV may seek relief from the operation of § 224(f) by invoking the provisions of § 224(f)(2). But on this record, there is neither a contention nor evidence that any such capacity, safety, or engineering problems exist.

In sum, an undivided interest in the OBV/OBM Easement is "owned or controlled" by OBV within the meaning of § 224(f) for the purpose of providing telecommunications services. Accordingly, Adelphia's motion for summary judgment with respect to this undivided interest in

---

**43.** Nothing in the result reached here is intended to limit or preclude OBM from pursuing its injunctive or other remedies should circumstances change in the future such that Adelphia's access to OBV's undivided easement rights results in a taking of, or interference with, OBM's easement rights. This is so because, as noted, § 224(f) does not authorize Adelphia to access or interfere with the easement rights of OBM, a nonutility. Of course, should Adelphia wish to use OBM's easement

rights, it may negotiate to purchase those rights from OBM.

**44.** The only possible burden on OBM identified by the Lansdowne Defendants is that OBM may be required by § 224(h) to provide written notification to Adelphia when OBM intends to modify or alter the easement. This minimal regulatory burden is not so great as to interfere with OBM's use and enjoyment of the easement or to constitute a taking.

the OBV/OBM Easement must be granted and OBV must provide Adelphia with access to the right-of-way.

## IV.

Adelphia also claims that § 224(f) should provide it with access to the "Exclusive Easement for Telecommunications Services" held by OBL. The threshold and determinative question with respect to the OBL Easement (which provides access to all lots in the Development through house connection lines) is whether OBL is a utility within the meaning of § 224(a)(1). Adelphia does not contend, nor is there any basis for finding, that OBL itself is a utility. Instead, Adelphia argues that OBV, which is a utility, effectively controls the OBL Easement through its parent and affiliate entities, and thus OBL should be considered a utility for purposes of the statute. This argument lacks merit, as OBV and OBL are distinct and separate entities and OBV neither owns nor controls the OBL Easement.

 In Virginia, a limited liability company is a legal entity separate and distinct from its members. *Jordan v. Commonwealth*, 36 Va.App. 270, 549 S.E.2d 621, 622–23 (2001). Courts may disregard the separate and distinct nature of business entities only in certain limited circumstances. *See, e.g., Perpetual Real Estate Services, Inc. v. Michaelson Prop., Inc.*, 974 F.2d 545 (4th Cir.1992) (refusing to disregard the corporate form because plaintiff failed to establish that the corporation was a sham to disguise the legal wrongs, fraud, or crimes of its sole shareholder). Although OBV and OBL share some ownership interests,[45] they are legally distinct companies. Adelphia asserts

that M.C. Dean's ownership interest in both OBL (through OSPE) and OBV means that OBV controls the OBL Easement for purposes of § 224(f). Adelphia, however, provides no factual or legal basis for arriving at the conclusion it advocates. Adelphia has neither alleged nor made any showing that OBV or OBL are sham entities used by M.C. Dean to disguise legal wrongs, fraud, or crimes. *See Perpetual Real Estate Services*, 974 F.2d at 548. Accordingly, there is no credible basis for arguing that OBL is a utility or that the utility OBV controls the OBL Easement: OBL is not a utility for purposes of the Pole Act merely because a party with an ownership interest in OBL is also the owner of a utility.

Because OBL is not a utility, the nondiscriminatory access provision of § 224(f) is inapplicable to the OBL Easement and Adelphia's motion for summary judgment with respect to the OBL Easement must be denied and the Lansdowne Defendants' motion for summary judgment with respect to the OBL Easement must be granted.

## V.

In sum, the extent of a utility's ownership or control of an easement or right-of-way for purposes of § 224(f) must be determined with reference to state law in accordance with the FCC's reasonable interpretation of the statute. Where a utility may voluntarily grant access to a third party and would be entitled to compensation for doing so, the Pole Act's nondiscriminatory access requirement applies. Accordingly,

(i) DVP's motion for summary judgment must be granted because the DVP

---

45. As noted in the facts, OBL is a limited liability company with two members, LCD Communications and OSPE, which each have a 50% voting interest. OSPE, in turn, is a wholly owned subsidiary of M.C. Dean, which also owns OBV. But LCD Communications is an unrelated entity owned by LCD. See Exhibit A to this memorandum opinion for a diagram of these relationships.

Easements do not include the rights to which Adelphia seeks access and hence DVP does not own or control rights-of-way in the Development within the meaning of § 224(f).

(ii) The Lansdowne Defendants' motion for summary judgment must be granted in part and denied in part. The motion must be granted with respect to the OBL Easement because OBL is not a utility subject to the Pole Act. The motion must be denied with respect to OBV's interest in the OBV/OBM Easement because OBV is a utility that owns and controls the OBV/OBM Easement with respect to telecommunications services rights and these rights are therefore subject to the nondiscriminatory access provision of § 224(f). But this result does not authorize Adelphia to interfere with OBM's easement rights.

(iii) Adelphia's motion for summary judgment must be granted in part and denied in part. The motion must be granted with respect to the OBV/OBM Easement, but the access Adelphia gains is only equal to the rights owned by OBV, which are of limited duration and geographic scope. The motion must be denied with respect to access to the OBL Easement and the DVP Easements.

**758**

1183365

1. On May 14, 2001, LCD granted an easement to LCD Communications, entitled, "Exclusive Easement for Telecommunications Services."

2. On May 14, 2001, LCD Communications granted an easement to OBL, with the consent of LCD, entitled "Exclusive Easement for Telecommunications Services."

3. On May 14, 2001, LCD granted an easement to OBV and OBM, entitled "Easement for Telecommunications Facilities."